CITY OF BOSTON & others[1] vs. AETNA LIFE INSURANCE
COMPANY & others.[2]

Suffolk. December 1, 1986. — April 9, 1987.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, & LYNCH, JJ.

Assignment. Insurance, Rate setting, Health and accident. Consumer Pro-
tection Act, Insurance, Availability of remedy. Practice, Civil, Standing.
Hospital, Costs.

A provision in a payment authorization form, signed by the patients of a
hospital, made an effective assignment to the hospital of the patients'
right to assert claims under their health insurance policies, even though
the word "assign" or language of similar import did not appear in the
form, where, in the circumstances, a reasonable patient would intend
by the form to transfer his insurance claim to the hospital. [571-573]
The city of Boston and certain of its officers were a "person who engages
in the conduct of any trade or commerce" and thus fulfilled any require-
ment of standing to assert a claim under G. L. c. 93A, § 11. [574-575]
Description of the legal interrelationship of patient, hospital, and health
insurer. [575-577]
On claims by the city of Boston, its board of health and hospitals, and the
the commissioner of its department of health and hospitals seeking de-
claratory and injunctive relief against several health insurers, a judge
correctly allowed the defendants' motions for partial summary judgment
declaring that neither St. 1976, c. 409, nor St. 1982, c. 372, statutes
under which the Rate Setting Commission annually approves schedules
of hospital charges, nor anything in the rate setting regulatory pattern,
required an insurer to pay hospital charges not covered by its applicable
policy of insurance or to pay particular charges set forth in a hospital's

---

[1] Board of health and hospitals and the commissioner of the department
of health and hospitals. We shall refer to the plaintiffs collectively as the City.

[2] John Hancock Mutual Life Insurance Company, Metropolitan Life Insur-
ance Company, The Prudential Insurance Company of America, and The
Travelers Insurance Company. We shall refer to the defendants collectively
from time to time as the insurers. A labor-management trust fund, the
trustees of MEBA Medical and Benefits Plan, were also named as defendants
but did not participate in the motions for summary judgment which are
involved in this appeal.

schedule of charges; that charges appearing on those schedules were not necessarily or presumptively fair and reasonable, or consistent with prevailing charges for like services; and that the regulatory statutes neither authorized the Rate Setting Commission to approve the reasonableness of individual charges nor required insurers to pay more than the applicable insurance policies provided. [577-582]

On claims by the city of Boston, its board of health and hospitals, and the commissioner of its department of health and hospitals seeking declaratory and injunctive relief against several health insurers, it was error for a judge to allow the motion of one defendant for partial summary judgment declaring that nothing in the rate setting regulatory pattern obliged any insurer to pay that portion of a hospital's charge that exceeded a fair and reasonable charge, because the insurer's obligation as to the payment of any lawful charge, even if not reasonably related to the costs of services rendered or to other charges in the locality for the same services, was to be governed by the language of the applicable insurance policy. [582-583]

CIVIL ACTION commenced in the Superior Court Department on December 30, 1983.

Motions for partial summary judgment were heard by *George N. Hurd, Jr., J.,* and questions of law were reported by him to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*William A. Horne* (*Paula V. Kaminow & James F. O'Brien* with him) for the plaintiffs.

*Lane McGovern* (*Pierce O. Cray & Lorraine A. White* with him) for The Travelers Insurance Company.

*Barry Nagler* for Aetna Life Insurance Company.

*Douglas G. Moxham* (*Howard M. Cooper* with him) for The Prudential Insurance Company of America.

*Stephen J. Paris* (*Michael F. Aylward* with him) for Metropolitan Life Insurance Company.

*Edward J. Duggan* (*Joseph H. Skerry, III,* with him) for John Hancock Mutual Life Insurance Company.

WILKINS, J. A judge of the Superior Court has reported the propriety of his orders denying a motion of the plaintiffs for partial summary judgment and allowing motions for partial summary judgment of the defendant insurers. The City seeks to recover from the insurers amounts which the City says the

insurers were obliged to pay as benefits under health insurance policies covering patients of the Boston City Hospital (BCH).

We outline the issues in general terms. The insurers' first series of motions for partial summary judgment concerns the question whether the City has standing to maintain an action directly against them. The City argues that insured BCH patients made effective assignments of their health insurance claims to the City and further that the City may properly present claims against the insurers under G. L. c. 93A, §§ 9 and 11 (1984 ed.). The judge rejected the City's standing claims.

For reasons we explain later, the judge went on to decide partial summary judgment motions dealing with aspects of the merits of the dispute. The insurers maintained that the City had no right to rely on regulatory statutes concerning hospital costs and charges as a basis for claiming that the insurers must accept BCH's charges for services as reasonable and must pay those charges without regard to the provisions in various insurance policies seeking to limit insurers' obligations to the payment of reasonable charges or to customary charges in the vicinity for like services. The judge accepted the insurers' arguments that the regulatory statutes had no effect on the rights of insureds against the defendant insurers in determining insurance coverage for services provided by BCH. We granted the City's application for direct appellate review.

We conclude that the City has standing to assert its patients' claims against the defendants. It has no standing to maintain any G. L. c. 93A, § 9, claim in the circumstances, but does have standing to assert G. L. c. 93A, § 11, claims. We further conclude that the judge was largely correct in ruling in favor of the insurers that their obligations were not affected by statutes and regulations dealing with reimbursable hospital costs and with hospital charges.

1. The insurers contended successfully before the motion judge that the City had no standing to assert claims arising under patients' health insurance policies because the patients had transferred no rights to the City. The insurers claim that the payment authorization form used by BCH prior to October, 1983, only authorized insurance companies to pay the City and

did not assign any contract or policy rights to the City. The form, known as HAP-4, which had been approved by the Health Insurance Council and accepted by the American Hospital Association for use by hospitals, provided as follows: "AUTHORIZATION TO PAY INSURANCE BENEFITS. I hereby authorize payment directly to the above named hospital of the Group Hospital Benefits herein specified and otherwise payable to me but not to exceed the hospital's regular charges for this period of hospitalization. I understand I am financially responsible to the hospital for charges not covered by this authorization."[3]

The word "assign" or "assignment" need not be used to make an effective assignment. "A valid assignment may be made by any words or acts which fairly indicate an intention to make the assignee owner of a claim." *Cosmopolitan Trust Co.* v. *Leonard Watch Co.*, 249 Mass. 14, 19 (1924). See *Kagan* v. *Wattendorf & Co.*, 294 Mass. 588, 596 (1936); 3 S. Williston, Contracts § 424 (3d ed. 1960). The important point is what the purported assignor did and what evidence there was of his intent. An order for payment can qualify as words of assignment, such as "kindly pay" (see *Andrews Elec., Inc.* v. *St. Alphonse Catholic Total Abstinence Soc'y*, 233 Mass. 20, 22 [1919]), or "please pay" to a third entity (see Restatement [Second] of Contracts § 325[1] illustration 3 [1981]). Here, however, the significant word is "authorize," a word which usually suggests permission (see *Welsh* v. *Spillane*, 311 Mass. 746 [1942]), or discretion (*New England Trust Co.* v. *Morse*, 243 Mass. 39, 45 [1922]), not a command, a direction, or order.

The circumstances of the signing and delivery of the form indicate that, even though only the word "authorize" is used, a reasonable patient would intend by the language of the form to transfer his or her claim against the insurance company to BCH. The patient wants to be removed from the collection process as soon and as fully as possible. The transfer of rights

---

[3] Other forms may have contained somewhat different language, but we are not advised of any whose language would lead us to a different result from that we reach dealing with HAP-4.

puts the claim in the hands of an experienced health care provider which is more likely to know and to protect the patient's interests than the patient alone could. One should not focus too intently on dictionary definitions in determining what the patient intended by signing the form which BCH and the insurance industry imposed on the patient. If the word "authorize" might cause a reasonable person to wonder whether he had effectively abandoned the field of battle over coverage to his insurer and BCH, the last sentence of the form would have dispelled any reasonable doubt. The statement that the patient-insured is "financially responsible to the hospital for charges not covered by this authorization" indicates that, because of what the patient has signed, the hospital understands and the patient intends that the hospital must look to the insurer for payment of insurance benefits covered by the authorization.

Beginning in October, 1983, and continuing to date, BCH has used an assignment form which patients must sign that clearly states that the patient is assigning to BCH all claims against third-party payors and insurers for services provided by BCH. The defendant insurers make no effective argument that this assignment form is insufficient to permit BCH to assert its insured patients' policy claims against them. We would, therefore, in any event reach the substantive arguments as to admissions to which the October, 1983, assignment form applied.[4] The judge's orders on the insurers' motions for partial summary judgment on the standing issues, were in error in so far as they were based on the absence of an assignment.[5]

---

[4] We believe that the motion judge did not intend that his allowance of partial summary judgment on the standing issue should apply to the City's claims arising out of BCH patient admissions covered by the new assignment form because, if he had, his action on the insurers' motions on the so-called rate setting issues would, on his approach, have been unnecessary.

[5] Because the City has standing as an assignee to assert its patients' claims, we do not discuss the City's claim that it is a third-party beneficiary of the insurance agreements and thus may sue the defendants. Counsel for Aetna argued the third-party beneficiary issue for all defendants before us orally and granted that we need not reach that issue if we concluded that execution

2. The motion judge allowed motions for partial summary judgment on the City's G. L. c. 93A, § 9 (1984 ed.), claims, ruling that the City lacked standing to maintain a § 9 claim. The failure of the City to allege the sending of a demand letter is fatal to its § 9 claim. See *Spring* v. *Geriatric Auth. of Holyoke,* 394 Mass. 274, 287 (1985); *Slaney* v. *Westwood Auto, Inc.,* 366 Mass. 688, 704 (1975). We need not, therefore, reach the question whether a person who is entitled to bring an action under G. L. c. 93A, § 11, may (also or alternatively) bring an action under § 9 as a "person whose rights are affected by another person violating the provisions of [G. L. c. 176D, § 3 (9)]." See St. 1979, c. 406, § 1, amending G. L. c. 93A, § 9 (1), discussed in *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675 (1983).[6]

The motion judge also allowed, on standing grounds, a motion for summary judgment of at least one insurer on the G. L. c. 93A, § 11, claim alleged by the City. Only Metropolitan's motion for summary judgment explicitly asserted the City's lack of standing to make a § 11 claim. The question before us is not whether the City has or might have a valid claim under § 11 but whether the City has standing to assert a § 11 claim. Thus, arguments that the insurers have not been shown to have

---

of the HAP-4 form or its equivalent was a valid assignment of rights to BCH.

In its brief Aetna refers to a provision concerning assignments appearing in its basic health insurance policy which states that "[n]o assignment of any present or future right, interest or benefit under this policy shall bind [Aetna] without its written consent." The judge's decision on the so-called standing issues was apparently not based on Aetna's or any other insurer's anti-assignment provision, a provision which does not appear in many other policies involved in this case. It appears that Aetna has paid claims to the City pursuant to forms similar to the HAP-4 form, at least some of which it supplied. That action may constitute written consent to the assignments. The issue of the effect of anti-assignment provisions was not resolved by the partial summary judgments.

[6] The City makes no argument that any § 9 rights were transferred to it by the authorization or assignment forms signed by insured patients. Its assertion to that effect, unsupported by reasons, does not qualify as argument. No G. L. c. 93A claim existed in favor of an insured when the form was signed, and the authorization and assignment language deals with insurance policy claims exclusively.

engaged in any unfair or deceptive act or practice or that the City has not suffered any loss of money or property have no significance here. These are issues concerning the existence of a claim, but they do not concern standing. If there is a standing requirement involved in § 11, it is that the plaintiff must be a "person who engages in the conduct of any trade or commerce." Surely, the City meets this test. See G. L. c. 93A, § 1. The allowance of any motion for partial summary judgment on G. L. c. 93A, § 11, claims on the ground of lack of standing must be vacated.

3. To understand our treatment of the judge's rulings on the various motions for partial summary judgment on the so-called rate setting issues, one must first understand the interrelationship of patient, hospital, and insurer.

The rights of an insured patient to the payment of insurance benefits depend on the coverage of the patient's health insurance policy. In some instances, health insurance policies provide for the payment of specific dollar amounts toward hospital charges, and the patient is responsible for the balance, if any, of those charges. In other instances, the policy may provide that the insurer will pay the hospital's charges for particular services. In such cases, insurance policies often protect the insurer by providing that any hospital's charge must be reasonable or, perhaps, that charges will be paid only to the extent not in excess of the reasonable and customary charges for the particular service in the community.

This case involves the latter form of coverage, insurers' agreements to pay hospital charges. This opinion does not, however, undertake to determine what various insurers' obligations are under particular policy language. Instead, it involves the question whether statutory provisions concerning the determination of hospital charges have modified the insurers' right to determine and pay charges as defined in their insurance policies.

The relationship between patient and hospital is a straightforward one under which the patient is obliged, directly or through his insurer, to pay the hospital's charges for those services the patient uses. Some hospitals, of which it has been suggested

BCH is one, may keep their room and board charges relatively low and their charges for ancillary services relatively high. Charges for a particular service may vary considerably among hospitals of the same type in the same locality. Of course, many patients are indigent, or at least medically indigent in the sense that they cannot meet the extraordinary costs of hospitalization. The consequence is that many hospitals extend free care voluntarily to certain patients or do so involuntarily and sustain bad debt losses. Because it is a municipal hospital in the Commonwealth's largest city, BCH furnishes a large proportion of the bad debt and free care services in Boston (about 50%) and in the State (about 25%). The consequences of BCH's efforts to recoup costs attributable to free care and bad debts from paying patients underlie the dispute in this case.

A contractual relationship between a hospital and a commercial health insurance company normally exists only if, as in this case, the patient has assigned rights against the insurer to the hospital. Payment by other third-party payors, such as reimbursement for services furnished to patients covered by Medicare, Medicaid, or Blue Cross, is generally based on cost determinations and not on charges. These cost-based reimbursement systems cover a substantial portion of BCH's patients. Patients who cannot pay also represent a large proportion of BCH's clientele. The result is that only approximately 9% of BCH's gross patient service charges are paid by patients who pay charges (themselves or through their insurers, or both). Although cost-based reimbursement may properly include an allowance for free care and bad debts,[7] any increase in charges to recover for bad debt losses and the cost of free care can only affect that small charge paying phalanx.

The Commonwealth's systems for the regulation of collectible costs and allowable charges in recent years have permitted BCH to establish charges for certain services well above costs reasonably allocable to the particular services furnished in order to allow BCH to recover at least a portion of its bad debt and

---

[7] See G. L. c. 176A, § 5 (1984 ed.); *Massachusetts Hosp. Serv., Inc.* v. *Commissioner of Admin.*, 351 Mass. 248 (1966).

free care losses from charge paying patients. These relatively high charges have prompted the defendant insurers to resist payment of many BCH charges, and that resistance in turn led to this action in which BCH seeks to recover its charges to insured patients which the defendant insurers have not paid in full. The insurers respond that their obligations are stated solely in their insurance policies and that the Commonwealth's regulatory schemes do not oblige them to pay charges and do not limit them in arguing that particular charges are in excess of the amount they agreed to pay in their insurance policies.

Before we discuss regulatory provisions applicable during the years involved in this action, we shall summarize the various motions for partial summary judgment which the judge allowed or denied. The judge reported for appellate consideration the propriety of his action on these motions.

The judge allowed insurance company motions for partial summary judgment which in effect declared that, despite certain statutes and regulations, the defendant insurers could rely on the provisions of their insurance policies in administering and defending claims by or on behalf of BCH patients. He concluded thereby that no statute either compelled the insurers to accept BCH charges as reasonable or endowed BCH's charges with special status.

It is important to understand the limited range of the judge's action on what he called the "rate setting issues."[8] Prudential, joined by Aetna and Travelers, moved for partial summary judgment asking for declarations which are set forth in the margin.[9] They obtained determinations which generally stated

---

[8] Our analysis would have been aided by the entry of an explicit partial summary judgment instead of simply the allowance of five motions for partial summary judgment. The absence of a centralized document requires us to discuss various motions in detail.

[9] "1. Nothing contained in Acts 1976 Chapter 409 ('Ch. 409'), or Acts 1982 Chapter 372 ('Ch. 372') or any regulations promulgated under either Act by the Rate Setting Commission ('RSC') requires commercial insurance companies to pay particular charges approved by the RSC for hospital services.

"2. Neither Ch. 409 nor Ch. 372, nor any regulations issued thereunder by the RSC, nor any action by the RSC, creates any presumption or legal

that no statute or Rate Setting Commission (RSC) regulation concerning the determination of hospital costs and charges required an insurer to pay any hospital charge not covered by the applicable insurance policy or required an insurer to pay particular BCH charges set forth in a schedule approved by the RSC. Additionally, the judge in effect declared that statutes and regulations concerning hospital costs and charges did not create a presumption or "legal recognition" that hospital charges shown on a schedule approved by the RSC were fair and reasonable or were consistent with prevailing charges for like services or supplies. Also, the judge accepted the principle that no insurer was obliged to pay BCH for any portion of a charge which exceeded a fair and reasonable charge.[10] It is only on this final principle that we disagree with the judge's determinations on Prudential's motion.

Metropolitan moved separately for partial summary judgment, combining the standing issues discussed in the first two sections of this opinion with so-called rate setting (or substantive) issues. The judge allowed Metropolitan's motion on the

recognition that particular charges contained in a schedule of such charges approved by the RSC are fair and reasonable or are consistent with prevailing charges in any area for like services or supplies, in determining the obligations of an insurer under its insurance contracts, in the absence of a prior express agreement upon the price for such charges.

"3. In the absence of a prior express agreement upon the price for a particular hospital service, no insurer is obligated by law to pay Boston City Hospital for that portion, if any, of a particular hospital charge which exceeds a fair and reasonable charge. Nothing in this ruling affects the standing or lack thereof in BCH to sue any insurer.

"4. Neither Ch. 409 nor Ch. 372, nor any regulations issued thereunder by the RSC, nor any action by the RSC, requires insurers to pay hospitals, including Boston City Hospital, for any hospital charge which is excluded or not covered by the provisions of the insurance contract under which the hospital makes a claim for payment.

"5. With respect to all claims made by Boston City Hospital under one or more policies of insurance which contain a provision for the exclusion of hospital charges in excess of the prevailing charge in the area for a like service or supply, a finding by a court that a portion of such a charge exceeds such prevailing charges would preclude Boston City Hospital from recovering such excess portion of the charge from such an insurer."

[10] The language of this aspect of the motion is set forth in the third numbered paragraph in n. 9, above.

standing issue and allowed the motion on two substantive grounds. One ground, with which we agree, was that St. 1976, c. 409, and St. 1982, c. 372, do not confer authority on the RSC "to approve the reasonableness of individual charges" nor do they obligate insurers "to pay benefits in excess of those provided for under the [applicable insurance] contracts."[11]

The judge properly allowed Hancock's motion for partial summary judgment which sought a declaration that St. 1976, c. 409, and St. 1982, c. 372, and related regulations and RSC practices "do not require Hancock to pay on the basis of the charges for particular services as listed in charge books submitted by BCH to the RSC." The motion was limited to the effect of a named group insurance policy which provided that Hancock would pay reasonable and customary charges and defined such a charge as one which "does not exceed the general level of charges being made by others of similar standing in the locality" in similar circumstances.

The judge denied the City's motion for partial summary judgment on the "rate setting issues." The City's motion did not explicitly state the grounds on which it relied but rather referred to a memorandum and other material not identifiable in the record appendix. In its reply brief before this court, the City characterizes its motion as having sought a ruling "that the insurance companies were not entitled, under any insurance policy provisions relating to reasonableness of charges, to

---

[11] The other substantive ground was that, if either St. 1976, c. 409, or St. 1982, c. 372, imposes such an obligation, it would be in violation of the State and United States Constitutions. This second determination, stated in paragraph six of Metropolitan's motion, raises and undertakes to resolve unspecified constitutional issues. No constitutional question should have been reached at this stage of the case. This is particularly so if, as Metropolitan argues in its brief here, the constitutional issues concerned an alleged impairment of the obligation of contract and denial of due process of law. The summary judgment motion material does not present support for the claim that the regulatory statutes in their Statewide operation denied Metropolitan's constitutional rights. This aspect of the order allowing Metropolitan's motion for partial summary judgment must be vacated.

substantially underpay charges established at Boston City Hospital and approved by the Massachusetts Rate Setting Commission, because those charges include, as authorized by the statutory charge control system, costs of free care and bad debt."[12] From our discussion of Prudential's partial summary judgment motion it will be apparent that the judge properly denied the City's motion for judgment on the rate setting issues.

We come then to the statutory regulation of hospital costs and charges in effect during the years involved in this action. The City relies on the regulatory scheme to argue that its charges are reasonable and lawful and must be accepted by the insurers even though they reflect consequences of BCH's burden of bad debt and free care. The insurers argue that the regulatory statutes neither establish a system that determines that BCH's charges are reasonable nor require insurers to pay BCH's charges without regard to the language of the applicable policies. The insurers are correct.

The regulatory statutes involved here are St. 1976, c. 409, and St. 1982, c. 372. We need not discuss the details of each act or their differences. A purpose of c. 409 was that a hospital not receive more revenue from all sources in one year for services furnished than its total reimbursable patient care costs in that year. In order to produce net revenues equal to related costs, a hospital's reasonable costs attributable to payors who pay or should pay charges would have to be adjusted upward by a factor to reflect the fact that not all persons in this charge payor category do in fact pay charges. A hospital could, therefore, it if wished, increase its charges to recognize the consequences of free care and bad debts with the anticipated result that its net (or collected) revenues will equal costs attributable to all patients in the so-called charge payor category. Under c. 409 the RSC annually approved a schedule of hospital

---

[12] The judge's report summarizes the City's contention to be that, even if BCH's charges for services are structured to permit it to recover costs of free care and bad debts, "the defendant insurers are required by their insurance contracts and the regulatory system to make full payment to BCH of BCH's charges to patients insured by them."

charges but did not determine the reasonableness of any particular charge. It only determined in effect that the charges set forth in a hospital's schedule applied to the anticipated level of utilization of services would produce net revenues no higher than the charge payors' share of patient care costs.

The allowable costs under c. 409 included the costs of free care and bad debts, and consequently the level of permissible collectible revenues could reflect those costs, if the hospital wished. In the case of BCH, whose ratio of free care and bad debt costs to total charges was substantially higher than other hopitals' (over 33% for BCH versus less than 5% Statewide), and whose revenue from paying patients was only about 9% of its gross patient service charges (and well below the Statewide average of 20%), the permissible level of gross charges designed to produce net revenue equal to costs allocable to patients in the charge payor category was substantially higher than in any other Massachusetts hospital. Early in 1982, BCH submitted a new charge schedule which revised BCH charges upward, although not to the maximum permissible level. This increase in charges led to the current controversy.

Chapter 372 became applicable to BCH for its 1984 fiscal year. There were numerous significant changes in procedures for the determination of hospital costs, but, for our purposes, the principles remained substantially the same. The RSC's obligation to analyze charges was probably even less under c. 372 than under c. 409. In any event, c. 372, like c. 409, set a limit on aggregate charges of a hospital and did not regulate, fix, or approve individual charges.

From this brief description of the regulatory pattern it is apparent that neither c. 409 nor c. 372 provided a means for determining reasonable hospital charges for individual services or a process that would endow individual charges with the mantle of reasonableness. All that can be said is that, taken collectively, BCH's charges were permitted by law and the recognition of bad debts and free care in hospital costs (and hence charges) was allowed. Nothing in either act restricted the rights of insurers to rely on their policy provisions in handling claims arising from the treatment of their insureds at BCH.

This conclusion comes from an overview of each act. It is reinforced as to c. 372 by § 1B of that act, inserting § 71 in G. L. c. 6A.[13]

The judge properly allowed Prudential's motion for partial summary judgment in so far as he determined that nothing in the rate setting regulatory pattern required an insurer (1) to pay a hospital charge not covered by the applicable policy or (2) to pay particular charges set forth in schedules filed with the RSC. His ruling to substantially the same effect on Hancock's motion for partial summary judgment was also proper. He was also correct in ruling on Prudential's motion for a declaration that the charges shown on those schedules were not necessarily or presumptively fair and reasonable or consistent with prevailing charges for like services or supplies. Similarly, the judge was correct in ruling on Metropolitan's motion for a declaration that the regulatory statutes neither authorized the RSC to approve the reasonableness of individual charges nor required insurers to pay more than their applicable insurance policies provided.

We disagree with the judge, however, in his conclusion to allow that part of Prudential's motion that stated in effect that no insurer was obliged to pay that portion of a BCH charge that exceeded a fair and reasonable charge. See n. 10 above for reference to the exact language. This conclusion is stated without regard to the language of the applicable policies, to the rights of BCH against an insured patient, or to the rights of the insured against the insurer. If an insurer has promised to pay a hospital's charges without any limiting language (such as reasonable charges or charges customary or usual in the locality) and the hospital is entitled to collect those charges from a charge paying patient, the insurer may have an obligation to pay those lawful charges even if they are not reasonably related to the costs of services rendered or to other charges in

---

[13] Section 71 states in relevant part: "Nothing in this chapter shall be construed to require payment by any third-party payor or purchaser, under any program or contract for payment or reimbursement of expenses for health care services, for: (a) services not covered under such program or contract; or (b) that portion of any charge for services furnished by a hospital that exceeds the amount covered by such program or contract."

the locality for the same service. It is not certain, as a matter of law, that under all circumstances an insurer will be relieved of an obligation to pay more than a "fair and reasonable charge." If the insured patient would be obligated to pay a charge, so would the insurer.[14]

We recognize that, applied on a Statewide basis, the position taken by the City could result in commercial insurers' paying no more than those free care and bad debt costs fairly allocable to services for which insurers pay charges. Some hospitals have relatively little free care or bad debts, and, therefore, charges and the insurers' obligations as to those hospitals are lower than they would be for a hospital with a higher proportion of free care and bad debts (assuming that such a hospital elected to recover free care and bad debt costs through increased charges). Taking the hospitals collectively and the insurers collectively (to eliminate variation among them as to where their insureds are hospitalized), the system could be viewed as coming out even, if all insurers paid charges, with charges too high in some hospitals and too low in others in relation to the Statewide average of the cost of free care and bad debts.[15] The missing element in the statutes is any mandate, express or implied, that insurers pay charges. The Legislature might have required it, but it did not.[16] We have

---

[14] If BCH has had uninsured patients capable of paying its charges, BCH's collection practices as to them may be some guide to what the obligations of insured patients and their insurers are in this circumstance.

[15] The balance on an over-all basis would probably not be precisely even. The distribution of commercially insured patients may not be proportionately uniform among hospitals. Indeed, if the City were correct that insurers must pay charges, BCH's charge structure would tend to encourage commercial insurers and cost-paying or experienced rated groups to urge that BCH not be used. Moreover, if all charges are not increased at a uniform rate, a higher than average utilization of ancillary services by charge paying patients than cost paying patients, for example, would tend to make the system work unevenly to the disadvantage of commercial insurers.

[16] By St. 1985, c. 574, § 12, adding § 75 to G. L. c. 6A, the Legislature took a different approach and prescribed for a period of two years, effective October 1, 1985 (St. 1985, c. 574, § 24), a Statewide uncompensated care pool "to more equitably distribute the burden of financing uncompensated acute hospital services across all acute hospitals." The costs of uncompen-

considered BCH's various further arguments and are not persuaded.

4. The judge's orders allowing the defendants' motions for partial summary judgment on all standing issues are vacated; provided, however, that a declaration that the Boston City Hospital lacks standing to assert G. L. c. 93A, § 9, claims in . this action should be entered. The order allowing the motions for partial summary judgment of The Prudential Insurance Company of America, the Aetna Life Insurance Company, and The Travelers Insurance Company is modified by deleting the provision contained in paragraph 3 of Prudential's motion (par. 3 in n.9 above), and as so modified is affirmed. The order allowing the motion for partial summary judgment of the Metropolitan Life Insurance Company is modified by deleting the reference to paragraph 6 concerning the unconstitutionality of St. 1976, c. 409, and St. 1982, c. 372, and as so modified is affirmed. The order allowing the motion for partial summary judgment of the John Hancock Mutual Life Insurance Company is affirmed. The order denying the plaintiffs' motion for partial summary judgment is affirmed.

*So ordered.*

---

sated care are distributed equitably among the acute care hospitals through a system that works somewhat like an assigned risk pool. This statute does not apply to the periods now involved in this case.